**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LARRY L. WILSON,** | : | |
| **Plaintiff,** | : | **Case No. 2:07-cv-1118** |
| **v.** | : | **Judge Holschuh** |
| **JOHN E. POTTER, Postmaster** | : | **Magistrate Judge King** |
| **General, United States Postal Service,** | : | |
| **Defendant.** | : | |
| | : | |

## MEMORANDUM OPINION & ORDER

Plaintiff Larry L. Wilson, an African-American male, brought this suit against his

employer, Defendant John E. Potter, Postmaster General of the United States Postal Service,

alleging race and gender discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This matter is currently before the Court on

Defendant's motion for summary judgment. (Doc. 17). For the following reasons, Defendant's

motion is **GRANTED IN PART and DENIED IN PART**.

## I.     Background and Procedural History

Plaintiff is an African-American male who has been an employee of the United States

Postal Service for nearly 40 years. (Wilson Dep. at 5; Wilson Aff. ¶ 4). Since June of 2003,

Plaintiff has held the permanent position of Manager of Distribution Operations ("MDO") on

Tour III at the Columbus, Ohio, Processing & Distribution Center ("P&DC").[1] (Decl. of Lauren

Harkins ¶ 8). This position is classified as EAS-20. As the MDO, Plaintiff reports to Charles

---

[1] There are three Tours of Operations or "shifts" at the Columbus P&DC. (Thomas
Kelley Dep. taken on Dec. 18, 2006 ("Kelley Dep. I") at 16 ).

Brown, the Lead MDO on Tour III. Brown's position is classified as EAS-24. (Brown Dep. at 6-7).

In December of 2003, Thomas Kelley began working at the Columbus P&DC as the new Plant Manager. (Kelley Decl. ¶ 6). In January of 2004, Plaintiff informed Kelley that he had previously filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against Jeffrey Bergen, the former Plant Manager, after Bergen passed him over for a promotion. (Kelley Decl. ¶ 13; Wilson Dep. at 22).

In June of 2004, Kelley approached Plaintiff and "asked him if he would take a detail assignment—that is a temporary assignment—as the acting MDO on Tour II." (Kelley Decl. ¶ 16). Tour II was not performing to Kelley's satisfaction and he had identified Plaintiff as an employee who could make a difference. (Id. at ¶¶ 14–15). In fact, Plaintiff had already served as Acting MDO on Tour II on two previous occasions, from May of 2000 through September of 2002, and again from January of 2003 through March of 2003. (Wilson Dep. at 7; Wilson Aff. ¶ 18).

Plaintiff accepted the detail assignment for a third time on the condition that he be classified as EAS-24, a rate of pay he felt equated to the responsibility of the position. (Wilson Dep. at 6–8). Plaintiff took the Acting MDO position on Tour II a third time believing that it would assist him in securing that job on a permanent basis. Kelley acceded to Plaintiff's request to be compensated at the EAS-24 level, but contends that he did so only to make up for the loss of "evening shift differential pay" that Plaintiff was receiving on Tour III. (Kelley Decl. ¶ 17). As Acting MDO on Tour II, Plaintiff reported directly to Kelley. (Id. at ¶ 18). Kelley testified that Plaintiff is "very good at what he does." (Kelley Dep. I at 58).

The last person to hold the permanent MDO position on Tour II was Kate Wiley, an African-American female. She was promoted and moved to Connecticut in May of 2000. (Wiley Dep. at 9–10). Since that time, the Tour II MDO position has been filled by various people on a temporary basis. On numerous occasions, Plaintiff has asked that he be appointed to fill that position on a permanent basis, but Kelley and Wiley have told him that the permanent Tour II MDO position no longer exists. (Kelley Dep. I at 13-14; Wiley Dep. at 13-14).

In June of 2005, Kate Wiley returned to Columbus as a District Manager. (Wiley Decl. ¶ 6). Kelley reported directly to her. (Id. at ¶ 7). Several years earlier, when Wiley was Plaintiff's supervisor on Tour II, Plaintiff had filed two complaints against her with the EEOC. (Wilson Aff. ¶ 7). Shortly after Wiley returned to Columbus, she brought all the managers and supervisors together for a meeting. (Wilson Dep. at 24-25.) At this meeting, Wiley allegedly said "I'm back, and I don't forget." (Id.) According to Plaintiff, Wiley later placed a phone call to Kelley, and the next morning Kelley came down to Plaintiff's office and said that Wiley did not think Plaintiff was a team player because he had not looked her in the eye during the meeting. (Id. at 26).

On December 23, 2005, Plaintiff, who was still the Acting MDO on Tour II, took a vacation. (Id. at 28). When he reported back to work on January 6, 2006, Kelley told him that he was sending him back to Tour III because Tour III was having some problems and they needed his help. According to Kelley, Tour III was short some higher level managers. (Id. at 28-29; Kelley Dep. I at 23, 47). Plaintiff maintains that Kelley made it clear that Wiley participated in the decision to return Plaintiff to Tour III. (Wilson Aff. ¶¶ 22-23). Plaintiff was replaced as Acting MDO on Tour II by Jocelyn Hall, an African-American female. (Hall Dep. at

7).

On January 23, 2006, Plaintiff filed another complaint with the EEOC. (Ex. 1 to Decl. of Marva Haye). He challenged both his removal from the detail assignment as Acting MDO on Tour II and Defendant's failure to place him in a permanent position as MDO on Tour II. He claimed that Defendant had discriminated against him on the basis of race and gender and had retaliated against him for having filed previous complaints with the EEOC. An administrative judge found that Plaintiff had failed to establish a prima facie case of race or gender discrimination or retaliation. (Ex. 3 to Haye Decl.). Plaintiff was given a right-to-sue letter on July 30, 2007. (Ex. 4 to Haye Decl.). He filed his Complaint on October 29, 2007, alleging race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. He requested back pay, front pay, lost fringe benefits, compensatory and punitive damages, as well as injunctive relief and reasonable attorneys' fees. Defendant has now moved for summary judgment.

## II.      Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains

for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." <u>Poller v. Columbia Broadcasting Sys.</u>, 368 U.S. 464, 467 (1962) (quoting <u>Sartor v. Arkansas Natural Gas Corp.</u>, 321 U.S. 620, 627 (1944)).  <u>See also</u> <u>Lansing Dairy, Inc. v. Espy</u>, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  <u>Lashlee v. Sumner</u>,  570 F.2d 107, 111 (6th Cir. 1978).  The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Weaver v. Shadoan</u>, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.  <u>Leary v. Daeschner</u>, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986);  <u>Wade v. Knoxville Util. Bd.</u>, 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original).  A

"material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material

facts." <u>Moore v. Phillip Morris Companies, Inc.</u>, 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. <u>Anderson</u>, 477 U.S. at 251-52; <u>Lansing Dairy, Inc.</u>, 39 F.3d at 1347.

**III.    Title VII Claims**

    **A.    Relevant Law**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using the <u>McDonnell Douglas</u> framework set forth below, by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action. <u>See</u> <u>Kline v. Tennessee Valley Auth.</u>, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." <u>Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.</u>, 176 F.3d 921, 926 (6th Cir. 1999). A facially discriminatory employment policy or an express

statement by a decision-maker of a desire to terminate employees because they belong to a protected class would constitute direct evidence of discrimination. See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

However, where the plaintiff has only circumstantial evidence of a discriminatory motive, claims under Title VII are analyzed under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Mitchell v. Toledo Hospital, 964 F.2d 577, 582 n.4 (6th Cir. 1992). Under that framework, a plaintiff must first establish a prima facie case of discrimination. The elements of a prima facie case differ depending on the theory of discrimination being asserted. If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802–03. If the employer articulates such a reason, the presumption of discrimination drops away, leaving only the issue of "discrimination *vel non*." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142–43 (2000).

The plaintiff must then prove, by a preponderance of the evidence, that the reason offered was pretextual. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing either that: (1) the proferred reason had no basis in fact; (2) the proferred reason did not actually motivate the adverse employment action; or (3) the proferred reason was insufficient to motivate the adverse employment action. See Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994); Peters v. Lincoln Elec. Co., 285 F.3d 456, 471–72 (6th Cir. 2002). The plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him. Burdine, 450 U.S. at

253.

**B.      Race and Gender Discrimination Claims**

Plaintiff's Complaint alleges that Defendant discriminated against him on the basis of race and gender by failing to promote him to a permanent position as MDO on Tour II and by removing him from his position as Acting MDO on Tour II to return him to his permanent position as MDO on Tour III.

**1.      Failure to Promote**

Plaintiff first alleges that Defendant discriminated against him on the basis of race and gender by failing to promote him to a permanent position as MDO on Tour II.  Plaintiff does not offer any direct evidence of race or gender discrimination.  The Court will therefore analyze this claim using the McDonnell Douglas framework.  Absent direct evidence, a plaintiff alleging discrimination based on a "failure to promote" theory can establish a prima facie case by showing that: (1) he is a member of a protected class; (2) he applied for and was qualified for the position; (3) he was considered for but was denied the promotion; and (4) the position remained open or was given to an individual with similar qualifications who was not a member of the protected class.  White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 240 n.3 (6th Cir. 2005).

It is undisputed that Plaintiff, as an African-American male, is a member of a protected class.  In addition, having served as the Acting MDO on Tour II for a total of more than three and one-half years and having received good performance evaluations, he is presumptively qualified to fill that position on a permanent basis.  However, Plaintiff cannot establish the remaining elements of a prima facie case without first establishing that a vacancy actually exists. If, as Defendant argues, the position has never been posted because there is no vacancy to be

filled, Plaintiff cannot show that he applied for that position, that he was considered for that position, or that the position remained open or was given to a similarly-qualified individual outside the protected class. In the Court's view, Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that a vacancy exists for a permanent MDO on Tour II.

Defendant maintains that after Kate Wiley left Columbus in 2000, her EAS-24 position as MDO on Tour II was traded for two lower-level manager positions. On July 13, 2001, Jeffrey Bergen, then the Plant Manager, requested that he be allowed change the staffing matrix at the Columbus P&DC to provide greater managerial flexibility. In a letter to Wayne Eggiman, Manager of Human Resources for the Allegheny Area, Bergen noted that he was "authorized (5) MDO EAS-24 positions of which one is vacant" and several EAS-16 positions. This staffing matrix, which contained no interim levels between EAS-16 and EAS-24, did not provide enough progressive promotional opportunities for lower level managers. Therefore, in exchange "for not filling the next MDO EAS-24 position that becomes vacant," Bergen requested that he be allotted two EAS-20 MDO positions. He also requested permission to change three EAS-16 positions for three EAS-18 positions. (Ex. A to Harkins Decl.).

On July 16, 2001, Gary McCurdy, Vice President of Area Operations for the Allegheny Area responded to Bergen's request as follows:

> We have reviewed and approve your request to exchange one vacant Tour III Manager, Distribution Operations, EAS-24 and one vacant Tour III Supervisor, Distribution Operations, EAS-16, for two Managers, Distribution Operations, EAS-20. Please note that these two Manager's positions are assigned to Tour III and the exchange is position neutral. Your Tour III EAS staffing is comprised of one Level 24 MDO, two Level 20 MDOs, and 25 Supv, Dist Oprns positions.

(Ex. B to Harkins Decl.). Plaintiff notes that this authorization refers only to *Tour III* positions,

and that Defendant has not produced any documentation concerning a similar exchange of positions on *Tour II*.

Despite the lack of formal documentation, the overwhelming consensus is that the permanent EAS-24 MDO position on Tour II no longer exists. On October 22, 2003, Bergen testified that although Columbus P&DC previously had five EAS-24 MDO positions, only two of those positions remained. He had traded in the other three EAS-24 positions, including Kate Wiley's, for multiple lower-level positions. (Bergen Dep. at 58-59).

When Kelley came on board as the new Plant Manager, he was told that Bergen had traded Kate Wiley's previous EAS-24 MDO position on Tour II for lower-level positions on Tours I and/or III. (Kelley Decl. ¶ 8). Kelley admits that he has never seen the documentation that eliminated the MDO position on Tour II. (Kelley Dep. I at 14, 19; Dep. of Thomas Kelley taken on September 26, 2008 ("Kelley Dep. II") at 10). Nevertheless, Kelley states that the position "does not appear on any relevant personnel and/or staffing records." (Kelley Decl. ¶ 9). Likewise, Lauren Harkins, the current Plant Manager at Columbus P&DC, stated that "[t]he permanent position of MDO on Tour II at the Columbus P&DC has not existed since July 2001. That particular position does not appear on any relevant personnel and/or staffing records for the Columbus P&DC from July 2001 to present day." (Harkins Decl. ¶ 13).[2]

When Kate Wiley returned to Columbus as the new District Manager, she learned that "the position I had previously occupied, permanent MDO on Tour II had been eliminated by then

---

[2] Charles Brown, the Lead MDO on Tour III, also testified that the EAS-24 MDO position on Tour II was "cashed in for two 20's" but it was his recollection that the exchange occurred some time in 2004 or 2005 when Rich Washington retired. (Brown Dep. at 8–11).

Plant Manager of the Columbus P&DC, Jeffrey Bergen in exchange for multiple lower level positions on Tours I and/or III." (Wiley Decl. ¶ 16). When Jocelyn Hall, who replaced Plaintiff as Acting MDO on Tour II, asked Kate Wiley whether a permanent position would be posted, Wiley responded that no permanent position existed. Wiley explained that Bergen had traded it for two EAS-20 positions. (Hall Dep. at 9-10).

In support of his position that the permanent EAS-24 MDO position on Tour II was never eliminated, Plaintiff points only to the absence of written documentation to that effect. In the Court's view, this is insufficient to create a genuine issue of material fact concerning whether such a vacancy exists. Based on the evidence presented, no reasonable jury could find that a permanent EAS-24 MDO position on Tour II still exists. It follows that Plaintiff cannot establish that he applied for that position, was considered for it but was denied the promotion, or that it remained open or was given to an individual with similar qualifications who was not a member of the protected class. Because Plaintiff cannot establish a prima facie case of "failure to promote," Defendant is entitled to summary judgment on this claim.[3]

_____

[3] Plaintiff's memorandum in opposition to the motion for summary judgment also hints at a claim of disparate treatment on the basis of race. It states, "[i]n contrast to Wilson's situation vis-a-vis the Tour 2 position, Kelley promoted Prescott Bellaire, white, to the Tour 1 MDO EAS 24 position within three to six months of that position becoming vacant in 2004. In addition, all other vacancies were filled within three to six months (Valerie Springhetti, white, and Joe Venera, white, promoted to Tour 1 MDO EAS 24 positions within three to six months of incumbent leaving position)." (Mem. in Opp'n at 17). However, Plaintiff's Complaint alleges no claim of disparate treatment, and Plaintiff fails to point to any evidence in the record to support the statement made in his brief. Even if Plaintiff had properly raised a claim of disparate treatment, Plaintiff would have to prove that these white individuals were "similarly situated in all relevant aspects." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). In light of the fact that Plaintiff has failed to establish that a vacancy exists on Tour II, it does not appear that a disparate treatment claim would be viable.

## 2. Removal from Position as Acting MDO on Tour II

Plaintiff also alleges that Defendant discriminated against him on the basis of race and gender by removing him from his position as Acting MDO on Tour II in January of 2006 and returning him to his permanent position as MDO on Tour III.   Because Plaintiff does not offer any direct evidence of discrimination, the Court must analyze this claim using the McDonnell Douglas burden-shifting test.

### a. Prima Facie Case

A plaintiff who alleges employment discrimination can present a prima facie case by showing that: (1) he is a member of a protected group; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected group, or similarly situated non-protected employees were treated more favorably.  Grace v. USCAR, 521 F.3d 655, 677 (6th Cir. 2008).

Plaintiff cannot establish a prima facie case of race discrimination because Jocelyn Hall, the person who replaced Plaintiff as Acting MDO on Tour II, is also African-American, and Plaintiff does not allege that any similarly situated non-protected employees were treated more favorably.  Defendant is therefore entitled to summary judgment on Plaintiff's race discrimination claim.

With respect to Plaintiff's claim of gender discrimination, the parties agree that Plaintiff can satisfy three of the four required elements.  Plaintiff is a member of a protected group (male), he was qualified for the position of Acting MDO on Tour II, and he was replaced by a person outside the protected group.  The parties disagree about whether Plaintiff suffered an "adverse employment action" when he was removed from his EAS-24 position as Acting MDO on Tour II

and sent back to his permanent EAS-20 position as MDO on Tour III.

In order to constitute an adverse employment action, there must be a "materially adverse change" in the terms and conditions of employment." Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999).  As explained by the Sixth Circuit,

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Id.  Defendant argues that Plaintiff's return to his permanent MDO position on Tour III constitutes nothing more than a shift change and, absent some evidence that Tour III is somehow less desirable than Tour II, a shift change does not constitute an adverse employment action.

In the Court's view, however, Plaintiff has presented sufficient evidence to support a finding that the removal from his position as Acting MDO on Tour II to his permanent position as MDO on Tour III constituted an "adverse employment action" as that term has been defined by the Sixth Circuit.  Even though he went from an EAS-24 position on Tour II to an EAS-20 position on Tour III, Plaintiff does not argue that the move resulted in any significant decrease in salary.  Presumably, upon his return to Tour III, he again received night differential pay which would have compensated for any difference in pay.  Plaintiff does argue, however, that because he was removed from the EAS-24 position, he did not receive certain salary increases to which he otherwise would have been entitled.  (Wilson Dep. at 77-80; Wilson Aff. ¶ 19).  Defendant presents no evidence to the contrary.

14

More importantly, Plaintiff argues that to the extent he hoped to someday be promoted to a permanent EAS-24 position as a Lead MDO, any additional experience he obtained as an Acting MDO on Tour II would be beneficial. In fact, Kelley testified that this experience would work to Plaintiff's advantage. (Kelley Dep. I at 60). Tour II has fewer employees and, therefore, requires fewer managers. As Acting MDO on Tour II, Plaintiff supervised the entire shift and reported directly to the Plant Manager. In contrast, as MDO on Tour III, he reported to Charles Brown, the Lead MDO on that shift. For this reason, a position as MDO on Tour III could well be considered a less distinguished title than Acting MDO on Tour II.

Finally, Plaintiff has presented evidence to support a finding that Tour II was more desirable than Tour III. Kelley and Wiley both testified that Tour II MDOs have fewer employees to supervise and fewer deadlines to meet. (Kelley Dep. I at 15–19; Wiley Dep. at 19–21; Kelley Decl. ¶ 11). Therefore, according to Plaintiff, being an MDO on Tour II was less stressful than being an MDO on Tour III. Construing the evidence in a light most favorable to Plaintiff, the Court finds that he has established a prima facie case of gender discrimination with respect to his removal as Acting MDO on Tour II.

### b. Legitimate, Non-Discriminatory Reason

Upon a prima facie showing of gender discrimination by Plaintiff, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802–03. "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (emphasis in

original) (<u>citing</u> <u>Burdine</u>, 450 U.S. at 254–55).

Defendant argues that Plaintiff was returned to his permanent position on Tour III because Tour III's performance was suffering and Plaintiff was needed to turn things around. Defendant also maintains that its staffing matrix for Tour III was short of managers. (Kelley Decl. ¶ 20; Kelley Dep. I at 58). The Court finds that Defendant has articulated a legitimate, non-discriminatory reason for the adverse employment action, thereby satisfying its burden of production.

### c.        Pretext

The burden now shifts back to Plaintiff to prove, by a preponderance of the evidence, that the reason offered by Defendant was pretextual. <u>See</u> <u>Burdine</u>, 450 U.S. at 253. Once again, Plaintiff can prove pretext by showing that (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the [adverse action]; or (3) the proffered reason was insufficient to motivate the [adverse action]. <u>See</u> <u>Manzer</u>, 29 F.3d at 1084 (6th Cir. 1994).

As evidence of pretext, Plaintiff points to the testimony of Charles Brown, Lead MDO on Tour III. Brown testified that he never requested additional managerial help on Tour III, and that he was unaware of any problems or instability that would have required Plaintiff to return to Tour III in January of 2006. (Brown Dep. at 14). Plaintiff also notes that after he returned to Tour III, Brown did not assign him to any particular area but rather let the MDOs decide which areas they wanted to cover. This suggested that no particular problem existed. (Wilson Aff. ¶ 27).

Plaintiff also argues that, contrary to Kelley's statement that there was a shortage of managers on Tour III, there was actually an overabundance. Within three months after Plaintiff

returned to Tour III, one of the other MDOs on that Tour, Nick Lacy, was permitted to leave on another detail assignment. (Wilson Dep. at 58). Plaintiff contends that if Tour III were actually understaffed or unstable, Kelley would not have permitted Lacy to leave. Kelley maintains that by the time Lacy left, operations on Tour III had significantly improved, thanks to Plaintiff's efforts. (Kelley Decl. ¶¶ 29–30).

In the Court's view, Charles Brown's testimony that he was unaware of any problems on Tour III, coupled with Nick Lacy's subsequent departure on a detail assignment, could support an inference that Defendant's proffered reasons for returning Plaintiff to Tour III were pretextual.

### d. Defendant's Honest Belief

The Sixth Circuit has held that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for [an adverse employment action], the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. . . . An employer has an honest belief . . . where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001) (quoting Smith v. Chrysler Corp., 155 F.3d 799, 806-07 (6th Cir. 1998)).

The burden falls on the employer to "point to specific facts that it had at the time the decision was made which would justify its belief in the proffered reason." Clay v. United Parcel Serv., Inc., 501 F.3d 695, 714 (6th Cir. 2007). "If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." Id. at 715 (citing Smith, 155

17

F.3d at 806). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." <u>Smith</u>, 155 F.3d at 807. The protection afforded by the honest belief rule is not automatic. The employee has an opportunity to present evidence to the contrary. <u>Id.</u>

Defendant claims that Kelley had an honest belief that Tour III needed to improve operations and that Plaintiff could help turn it around. Defendant, however, has not pointed to any particularized facts to support a finding that Tour III's performance was suffering or that additional managers were needed. The Court finds there are genuine issues of material fact regarding whether Defendant had an honest belief that Plaintiff's managerial skills were needed on Tour III. The Court therefore denies Defendant's motion for summary judgment on Plaintiff's gender discrimination claim in connection with Plaintiff's removal from his position as Acting MDO on Tour II.

### C.     Retaliation Claim

Plaintiff also alleges that because he had filed earlier complaints of discrimination with the EEOC, Defendant retaliated against him by failing to award him the permanent Tour II MDO position and by removing him from his position as Acting MDO on Tour II and sending him back to Tour III. Again, Plaintiff does not offer any direct evidence of retaliation. The Court will therefore analyze Plaintiff's claim under the <u>McDonnell Douglas</u> framework.

In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in activity protected by Title VII; (2) the defendant knew of this exercise of protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff, or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal

connection between the protected activity and the adverse employment action.  See Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009).

Defendant apparently concedes that Plaintiff has established the first two prongs of a prima facie case of retaliation.  Plaintiff engaged in protected activity when he filed complaints with the EEOC against former Plant Manager Jeffrey Bergen and against Plaintiff's former supervisor Kate Wiley.  Plant Manager Thomas Kelley was aware that Plaintiff had filed an EEOC complaint against Bergen.  (Kelley Decl. ¶ 13).  District Manager Kate Wiley also knew that Plaintiff had previously filed complaints with the EEOC.  (Wiley Dep. at 41).  The Court therefore will focus on the last two elements of the prima facie case.  Defendant argues that Plaintiff cannot show either that Defendant subjected him to a materially adverse employment action, or that there was a causal connection between Plaintiff's decision to engage in protected activity and the adverse employment actions alleged.

"[A] plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context."  Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595-96 (6th Cir. 2007) (citing Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53, 67-68 (2006)).  In the retaliation context, a "materially adverse employment action . . . consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Id. (quoting Burlington Northern, 548 U.S. at 68).  The Sixth Circuit has described this as "a relatively low bar."  Id. at 596.

The Court has already found that Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that a permanent MDO position exists on Tour II.  Therefore,

Defendant's failure to promote Plaintiff to that non-existent position cannot form the basis for a retaliation claim. However, in the Court's view, Defendant's conduct in removing Plaintiff from his position as Acting MDO on Tour II and returning him to his permanent position as MDO on Tour III might well discourage other workers from making or supporting charges of discrimination. For purposes of establishing a prima facie case, Plaintiff has, therefore, presented sufficient evidence of a materially adverse employment action.

Nevertheless, based on the evidence presented, Plaintiff cannot establish a causal connection between this adverse employment action and Plaintiff's protected activity. Plaintiff's burden at this stage is "not onerous" but Plaintiff must produce some evidence from which a court can infer a causal connection between the retaliatory action and the protected activity. Nguyen v. City of Cleveland, 229 F.3d 559, 565–66 (6th Cir. 2000). In this case, no such inference arises.

With respect to Plaintiff's claim that Kelley retaliated against him by removing him from his position as Acting MDO on Tour II and returning him to his permanent position on Tour III, Plaintiff faces two major hurdles, namely temporal proximity and the same actor inference. The Sixth Circuit has held that when the alleged retaliatory conduct occurs more than a few months after the protected conduct, a plaintiff cannot withstand summary judgment without providing additional evidence of causation. See Hamilton v. Starcom Mediavest Group, Inc., 522 F.3d 623, 629-30 (6th Cir. 2008) (holding that additional evidence of causation was needed considering that nine months had elapsed between protected activity and adverse employment action). In this case, two and one-half years elapsed between the date Plaintiff filed his last EEOC complaint against Bergen (June 17, 2003) and the date Kelley removed Plaintiff from his

position as Acting MDO on Tour II (January 6, 2006).  Plaintiff has pointed to no other evidence to establish the requisite causal connection.

In addition, the fact that Kelley appointed Plaintiff as Acting MDO on Tour II and agreed to pay him at an EAS-24 level, knowing that Plaintiff had filed a complaint against Bergen, cuts against any finding of causation. The Sixth Circuit has applied the "same actor inference" in employment discrimination cases, allowing the factfinder to infer a lack of discrimination "from the fact that the same individual both hired and fired the employee."  Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995).  This same reasoning is easily extended to Plaintiff's retaliation claim.  A lack of retaliatory motive can be inferred from the fact that, even though he knew about Plaintiff's complaint against Bergen, Kelley asked Plaintiff to step up to the more prestigious Acting MDO position on Tour II and agreed to pay him at an EAS-24 level.

Plaintiff's retaliation claim against Kate Wiley is also insufficient to withstand summary judgment.  There is some question about whether Wiley participated in the decision to remove Plaintiff from his position as Acting MDO on Tour II.  Kelley maintains that he was the sole decision-maker.  (Kelley Decl. ¶¶ 20–21).  Wiley acknowledges that Kelley notified her of his decision, but states that she had no input and "neither suggested, instructed, recommended, or disapproved of this particular personnel action."  (Wiley Decl. ¶ 9; Wiley Dep. at 25).  Plaintiff, however, avers that Kelley told him that "we had a meeting" in which it was decided to move Plaintiff back to Tour III, and "made it clear to me that Wiley was part of that decision making process."  (Wilson Aff. ¶¶ 22-23).

Even assuming that a reasonable jury could find that Wiley played a part in the decision, Plaintiff has failed to present sufficient evidence from which a jury could find a causal

connection between his protected activity and the adverse employment action. Plaintiff filed EEOC complaints against Wiley while she was his supervisor on Tour II, a position she held from 1993 to 2000. (Wilson Aff. ¶ 7; Wiley Dep. at 40-41; Wiley Decl. ¶ 15). Wiley testified that she was aware that Plaintiff had filed EEOC complaints, but that it was "a long time" ago, and she did not remember whether the complaints concerned any decisions that she made that had adversely affected him. (Wiley Dep. at 41). In any event, at least six years elapsed between the time Plaintiff filed those complaints (2000 at the latest) and the time Wiley allegedly participated in the decision to remove him from his position as Acting MDO on Tour II (2006). This lengthy temporal gap makes it nearly impossible for Plaintiff to establish causation.

Plaintiff testified that a couple of months after Wiley returned to Columbus in June of 2005, during a meeting with managers, she said "I'm back, and I don't forget." (Wilson Dep. at 25). Wiley does not recall making that statement. (Wiley Dep. at 41). But even if she did make that statement, Plaintiff does not allege that it was specifically directed at him. Absent any corroborating evidence, Plaintiff's speculation that this statement may have foreshadowed his removal from his position as Acting MDO on Tour II several months later is insufficient to create a genuine issue of material fact with respect to causation.

Since Plaintiff has failed to present sufficient evidence from which a reasonable jury could find the requisite causal connection between his protected activity and the allegedly retaliatory action taken against him, he has failed to establish a prima facie case of retaliation. Defendant is therefore entitled to summary judgment on this claim.

## IV. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (Doc. 17) is

**GRANTED IN PART and DENIED IN PART**.  The Court **GRANTS** summary judgment in favor of Defendant on Plaintiff's claims of race discrimination and retaliation.  However, the Court **DENIES** summary judgment on Plaintiff's claim that Defendant discriminated against him on the basis of gender when he was removed from his position as Acting MDO on Tour II and returned to his permanent position as MDO on Tour III.

**IT IS SO ORDERED.**


Date: May 22, 2009                                    **/s/ John D. Holschuh**
                                                      John D. Holschuh, Judge
                                                      United States District Court